UNITED STATES DISTRICT COURT
SOUTHERN DISTRCT OF FLORIDA
MIAMI DIVISION

CASE NO.: 1:14-cv-23600-LENARD/GOODMAN

INSTITUTE OF CONTEMPORARY
ART, MIAMI, INC.,

       Plaintiff,

v.

PHILADELPHIA INDEMNITY
INSURANCE COMPANY,

       Defendant.
_____/

### PLAINTIFF'S RESPONSE MEMORANDUM IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

Plaintiff, INSTITUTE OF CONTEMPORARY ART, MIAMI, INC. ("**ICA**" or the "**Insured**"), through undersigned counsel, files this Response Memorandum in Opposition to Motion for Summary Judgment (the "**Motion**") filed by Defendant PHILADELPHIA INDEMNITY INSURANCE COMPANY (the "**Insurer**").

### I.     INTRODUCTION

The Insurer's Motion is based on incorrect and incomplete facts, and should be denied. A **Claim**[1] was made against the Insured, which was duly noticed to the Insurer, and therefore the Insurer is obligated to reimburse the Insured's **Defense Costs**. Although omitted in the Insurer's Motion, on May 20, 2014 counsel for the Insured gave notice of and sent the Insurer a true copy of an April 29, 2014 Notice of Default from the City of North Miami (the "**City**") to the Board of

---

[1] For the Court's convenience, terms defined in the Policy are **bolded** throughout this Memorandum.

Trustees of the Museum of Contemporary Art (the "**Notice of Default**").[2]  *See* Opposition Statement of Material Facts ("**OSMF**") ¶ 14.  The Notice of Default was a demand in writing for monetary and/or non-monetary relief from the Board and its members (insureds under the Policy), and constituted a "**Claim**" as that term is defined in the Policy.  *See id.*  Notice to the Insurer of the Notice of Default triggered coverage under the Policy.  *See infra* at 10-12.  These facts dispositively undermine and foreclose the Insurer's Motion.

Moreover, the Insured's reference to an "anticipated" or "potential" counterclaim by the City of Miami against the Insureds does not diminish the status of the Notice of Default as a **Claim** under the Policy, nor does it diminish the Insured's giving notice of the **Claim** to the Insurer.  First, the Insured's forwarding the Notice of Default constituted "reporting" the **Claim** to the Insurer, thus meeting the notice requirements of the Policy.  Second, the Insurer's actions demonstrate that it had actual notice of the **Claim** after it was reported, as evidenced by the Insurer's correspondence and *acceptance of attorneys' fee bills*.

Furthermore, even if the Insured's notice of the **Claim** was for some reason insufficient (which it was not), the Insurer is estopped from making any such argument.  The Insurer knew that the Insured believed the duty to defend had been triggered under the Policy (as demonstrated by the Insured's correspondence and requests to the Insurer for payment of attorneys' fees), but failed to inform the Insured that it was purportedly mistaken.  OSMF ¶ 26.  In the Insured's May 20, 2014 letter attaching the Notice of Default, counsel for the Insured requested that the Insurer "acknowledge *the Insured's claim for coverage under the Policy* and to acknowledge and approve the retention of our Firm in connection with this matter."  *Id.* ¶ 15 (emphasis added).  In

---

[2] Plaintiff ICA is the assignee of the right, title and interest to the claims of the Museum of Contemporary Art ("MOCA") against the Insurer arising under the Policy.  Defendant's Statement of Facts ("**Def. Stmt.**") ¶ 30.

response to this request, the Insurer failed to dispute the status of the "claim for coverage under the Policy." *Id.* ¶ 16. Rather, the Insurer responded with a *reservation of rights* letter that listed at the top a "Claim File" number, making a self-styled "coverage reservation." *Id*. Obviously, a "coverage reservation" can only occur if there is "coverage" in the first instance. Furthermore, in correspondence and conversations between counsel for the Insured and the Insurer in June, July and August 2014, it was clear and obvious that counsel for the Insured had been led to believe that coverage was triggered under the Policy. *Id.* ¶¶ 14-15, 26. For example, counsel for the Insured sent the Insurer attorneys bills to be paid pursuant to the Policy, yet the Insurer failed to contend or even mention – for a period of months – that it disputed the very existence of a **Claim** or notice thereof. *Id.* ¶ 26.

As set forth more fully below, the Notice of Default was a **Claim** under the Policy, and it is undisputed that notice of the **Claim** was given to the Insurer. To the extent the Insured's notice of the **Claim** was unartfully worded, it was still effective notice of the **Claim**, and in any event the Insurer is estopped from claiming it had no notice. Accordingly, the Motion should be denied.

## II. FACTUAL BACKGROUND

Although the Insurer correctly cites the provisions of the Policy, the Insurer's statement of the background facts fails to account for critical aspects of the correspondence between the Insured and the Insurer leading up to this litigation.

### A. The Insured's May 20, 2014 Letter Giving Notice

On May 20, 2014 counsel for the Insured sent a letter (the "**May 20th Notification Letter**") to the Insurer giving notice of potential covered counterclaims against the Insured in its ongoing litigation with the City of North Miami, and further giving notice of and attaching a

3

Notice of Default dated April 29, 2014 from the City of North Miami to the Insured (defined above as the "**Notice of Default**").  OSMF ¶ 14.  The Notice of Default was a written demand for monetary and/or non-monetary relief against the Insured.  *Id.*  Specifically, the Notice of Default demanded that the Insured cure fifteen (15) separate purported defaults within thirty (30) days and "to provide a full and complete accounting, including the location of each item in the art collection, to confirm it remains intact regardless of location."  *Id.*  The May 20th Notification Letter further stated (a) "the Insured has elected Kluger, Kaplan, Silverman, Katzen & Levine, P.L. as its counsel of choice," and (b) "[p]lease respond to this letter to acknowledge the Insured's *claim for coverage* under the Policy and to acknowledge and approve the retention of our Firm in connection with this matter."  *Id.* ¶ 15 (emphasis added).  The May 20th Notification Letter thus attached the Notice of Default and asked that the Insurer acknowledge the Insured's "claim for coverage under the Policy."  *Id.*  The May 20th Notification Letter concluded by stating "please contact us with further questions."  *Id.* ¶ 15.

### B.  The Insurer's May 30, 2014 Reservation of Rights Letter

The Insurer then sent a letter dated May 30, 2014 to counsel for the Insured acknowledging receipt of the May 20th Notification Letter and the claim for coverage made therein.  *Id.* ¶ 16.  The May 30th letter did not deny coverage (in response to the Insured's May 20th request that the Insurer "acknowledge the Insured's claim for coverage") or contend that there was a lack of any **Claim** under the Policy that would amount to a denial of the Insurer's duty to reimburse **Defense Costs**.  *Id.*  Rather, the May 30th letter made reference to certain exclusions that could potentially defeat coverage and indemnification in the future, and made clear that it *had not* denied coverage, stating:

> "The above reservation of rights is not intended to be all inclusive.
> PIIC reserves all of its rights under the policy and all applicable

>law including *the right to deny coverage* in whole or in part based upon currently available or later discovered information."

*Id.* (italic emphasis added).  Reserving the right to deny coverage, without explicitly doing so, does not amount to a denial of coverage.  After explicitly *not* denying coverage, but rather *reserving* its rights (which is a normal step at such a juncture) the letter stated "[w]e trust your understanding of the above stated <u>coverage position</u> is clear," and "[y]ou certainly have the option of retaining separate legal counsel, at your own expense, to advise you of your options relative to our <u>coverage reservation</u>."  *Id.* (emphasis added).  It was thus clear from the May 30th letter that the Insurer *had not* denied coverage of **Defense Costs** under the Policy or stated any lack of conditions precedent for coverage to be triggered under the Policy, but instead made a common reservation of rights.  *Id.*

### C.  Correspondence in June 2014

In the days following the Insured's receipt of the Insurer's May 30th letter, counsel for the Insured had a phone call with John Magee, the claims representative of the Insurer.  OSMF ¶ 28.  Counsel for the Insured gave an update regarding the litigation between the Insured and the City of North Miami, and they discussed the Insurer's approval of the Insured's counsel under the Policy.  *Id.* ¶ 29.  At no time did Mr. Magee advise counsel for the Insured of any contention that (a) no **Claim** had been made against the Insured, or (b) that the Insured's notice of the **Claim** was in any way insufficient (and that consequently no defense would be provided by the Insurer).  *Id.*

In the following two (2) weeks, counsel for the Insured left Mr. Magee several voice messages regarding the **Claim**, and he finally returned the call on June 20, 2014.  *Id.* ¶ 30.  During the June 20th phone call, counsel for the Insured asked for confirmation of the Insurer's approval of Kluger Kaplan as counsel of choice by the Insured and what else, if anything, was

needed for reimbursement of **Defense Costs** by the Insurer.  *Id.*  Contrary to the Insurer's assertions in its Motion, counsel for the Insured did not just ask for "rates and guidelines" in the June 20th phone call.  *Id.*  In response, Mr. Magee sent counsel for the Insured an email that same day stating that the Insurer "is agreeable to retaining Kluger & Kaplan to represent Museum of Contemporary Art in the above captioned matter subject to the following rates…"  *Id.* ¶ 31.  The Insurer's email requested that "[c]opies of all invoices should be forwarded to PIIC so we can track the retention," and attached the Insurer's "Litigation Guidelines and Proposed Budget" and "Litigation Plan and Proposed Budget."  *Id*.  The June 20th email from the Insurer mentioned *nothing* of there not being a **Claim**, and mentioned *nothing* of any refusal by the Insurer to finance the defense.  *Id.*  On the contrary, the June 20th email appears to be a formal acceptance of the Insured's choice of counsel to defend the **Claim**, as had been requested by counsel for the Insured.  *Id.*  Indeed, there was no reason to provide counsel with rates and guidelines if the Insurer believed there was no **Claim** and had no intention to reimburse attorneys' fees.

The Insurer would have the Court believe that the subject line of the June 20th email – "The City of North Miami v. MOCA" – referred to the counterclaim threatened by the City, and not the **Claim** in the Notice of Default.  However, that line was reasonably understood to simply refer to the City's status as "claimant" with respect to the **Claim** in the Notice of Default.  OSMF ¶ 31.

### D. July Correspondence and the Insurer's Foot-Dragging

On July 23, 2014 Mr. Magee emailed counsel for the Insured and asked for an update on the litigation with the City of North Miami.  OSMF ¶ 21.  In response, on July 30, 2014 counsel for the Insured sent a letter to the Insurer giving an update on the litigation and mediation, and concluded:

> Also enclosed please find our firm's statements for services rendered through June 30th, 2014 in representing the insureds. Please review and place them in line for payment pursuant to the policy's Defense and Settlement Provisions.
>
> We will of course keep you apprised of all significant developments. Should you have any questions or concerns, please do not hesitate to contact me.

*Id.* ¶ 25.

Attached to the July 30th letter were the Insured's bills for attorneys' fees. *Id.* ¶ 26. Although the Insurer now states that its position at that time was that no defense coverage had been triggered under the Policy, the Insurer failed to notify or clarify its position with the Insured or raise any such issues for more than a month. *Id*. Rather, the Insurer simply delayed until this litigation was instituted over its foot-dragging. *Id*. Had the Insurer truly believed that the May 30th Notification Letter was insufficient to constitute notice of a **Claim**, then the Insured's sending attorneys bills to be paid under the Policy in July 2014 would have immediately put the Insurer on notice of its obligation to voice its contentions to the Insured. *Id.* However, instead of raising this issue with the Insured or notifying the Insured that there had been any kind of misunderstanding (as the Insurer requested: "Should you have any questions or concerns, please do not hesitate to contact me"), the Insurer waited more than a month without responding to the July 30, 2014 letter. *Id.* On or about August 14, 2014 counsel for the Insured sent *another* set of bills for attorneys' fees, again requesting that the Insurer pay them. *Id.* Then, on or about August 25, 2014 counsel for the Insured sent *another* letter to the Insurer, sternly requesting payment under the Policy. *Id.* Finally, on September 4, 2014, after three letters from the Insured enclosing two sets of bills for attorneys' fees, and in response to several voicemails by counsel for the Insured, John Magee as representative of the Insurer stated in an email: "I am in receipt of your voice mails concerning the legal bills tendered to PIIC in the above captioned matter.

7

PIIC is currently reviewing all the bills in question and will provide you with formal response by the beginning of next week." *Id.* Had coverage of **Defense Costs** not been triggered at all, there would have been no need to "review[ ] all the bills in question," nor should the response have taken more than a month. *Id.*

The first time the Insurer *ever* raised the issue of lack of **Claim** was after this litigation had begun. *Id.*

### III.   ARGUMENT

#### A.  Standard for Motion for Summary Judgment

"The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Ferriol v. Brink's Inc.*, 841 F. Supp. 411, 412 (S.D. Fla. 1994) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).  "In applying this standard, the *Adickes* Court explained that when assessing whether the movant has met its burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion." *Id.* "All reasonable doubts about the facts should be resolved in favor of the non-movant." *Id.*

"Under Florida law, the issue of an insurer's duty to defend a lawsuit against its insured is governed by the terms of the policy and the allegations of the complaint." *Chestnut Associates, Inc. v. Assurance Co. of Am.*, 17 F. Supp. 3d 1203, 1209 (M.D. Fla. 2014).  "If the complaint alleges any claim that, if proven, might come within the insurer's indemnity obligation, the insurer must defend the entire action." *Id.*

"A policy provision should be enforced, whether it is a basic policy provision or an exclusionary provision, if it is clear and unambiguous." *Falcon Trust Group, Inc. v. Travelers Cas. & Sur. Co. of Am.*, 725 F. Supp. 2d 1363, 1367 (S.D. Fla. 2010). "[I]f and when genuine

inconsistency, uncertainty, or ambiguity in meaning remains after resort to ordinary rules of construction, *__then the provision should be construed in favor of the insured__*." *Id.* (quotation and citation omitted) (emphasis added).

### B.  Defense Coverage Was Triggered Under the Terms of the Policy

Based on the terms of the Policy, and without resort to estoppel or any other rules of law, the Insured is entitled to obtain its **Defense Costs** from the Insurer regarding its defense of the **Claim** in the Notice of Default.  Part 1 of the Policy provides that

> The **Underwriter** will pay on behalf of the **Organization**, **Loss** from **Claims** made against the **Organization** during the **Policy Period** (or if applicable during the Extension Period) and reported to the **Underwriter** pursuant to the terms of this policy, for a **D&O Wrongful Act**.

Def. Stmt. ¶ 3.  Thus, to the extent

(1) a **Claim** for

(2) a **D&O Wrongful Act** was made against the Insured

(3) during the **Policy Period** and

(4) reported to the Insurer,

the Insurer is obligated to pay the **Loss**.

#### 1.  The Notice of Default was a Claim Under the Policy

A **Claim** is defined in pertinent part as "[a]ny written demand for monetary or non-monetary relief."  *Id.* ¶ 5.  The Notice of Default meets this description, as it was a *__written demand__* to cure fifteen (15) separate purported defaults and "to provide a full and complete accounting, including the location of each item in the art collection, to confirm it remains intact regardless of location."  OSMF ¶ 14.  Therefore, the Notice of Default was a **Claim.**

#### 2.  The Notice of Default was for a D&O Wrongful Act

9

A **D&O Wrongful Act** is defined as an "[a]ct, error, omission, misstatement, misleading statement, neglect, breach of duty or **Personal & Advertising Injury** committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**, or by the **Organization**." Def. Stmt. ¶ 4.  Here, the Notice of Default alleged acts by the Insured (the truth of which the Insured fully denies) meeting this description, including allegedly being "in default in the performance of the required covenants and conditions of the Agreement" with the City of North Miami, alleged breach of fiduciary obligation, alleged breach of public and the City's trust, alleged misappropriation of funds, among other alleged acts and defaults.  OSMF ¶ 14.

### 3. The Notice of Default was Served During the Policy Period

The Policy Period was from December 2013 – December 2014.  Def. Stmt. ¶ 2.  The Notice of Default is dated April 29, 2014 and was served on the Insured on or about that date. OSMF ¶ 14.  Therefore, the Notice of Default was served on the Insured during the **Policy Period**. *Id.*

### 4. The Notice of Default was Reported to the Insurer

The Insurer admits that the Notice of Default was reported and forwarded to the Insurer on May 20, 2014.  Def. Stmt. ¶ 14.  The Insured's reference at that time to "anticipated" or "potential" claims does not diminish the fact that the Notice of Default was "reported to the **Underwriter**." OSMF ¶ 14.  Thus, notice of the **Claim** (i.e. the Notice of Default) was given to the Insurer, thereby triggering its obligation to defend under the Policy (or reimburse **Defense Costs**).

Moreover, to the extent any factual issue exists as to the efficacy of the Insured's May 20th Notification Letter, courts do not require any "magic words" to give notice, and the Insurer demonstrated its *actual knowledge* of the **Claim** as of May 2014.  *See In re The Complaint of*

*RLB Contracting, Inc., as Owner of the Dredge Jonathan King Boyd its Engine, Tackle, Gear for Exoneration or Limitation of Liab.*, 773 F.3d 596, 605 (5th Cir. 2014) (courts use "a broad and flexible standard of review—reading letters of notice in their entirety and considering their 'whole tenor'—when determining if sufficient notice was given."); *Tracey v. Barrett*, 550 So. 2d 558, 560 (Fla. 2d DCA 1989) ("Any manner of written notice which describes the occurrence underlying the claim should suffice.").

As set forth above (*supra* at 3-8), after receiving notice of the Notice of Default, the Insurer demonstrated its actual knowledge of the **Claim**, given that the Insurer:

- made a *reservation of rights*, or a "*coverage reservation*," suggesting that defense coverage had been triggered (OSMF ¶¶ 15-16);

- failed to deny coverage of **Defense Costs** in response to the Insured's May 20th request that it "[p]lease respond to this letter to acknowledge the Insured's *claim for coverage* under the Policy and to acknowledge and approve the retention of our Firm in connection with this matter" (*Id.* ¶ 16);

- requested updates on the status of the dispute within which the **Claim** was made by the City of North Miami against the Insured (*Id.* ¶¶ 18, 21, 28);

- approved the Insured's choice of counsel in connection with the **Claim**, requesting bills for attorneys' fees and attaching litigation guidelines (*Id.* ¶¶ 20, 28-31);

- received on three separate occasions the Insured's bills for attorneys' fees and requests for payment without notifying the Insured of any contention that coverage of **Defense Costs** had purportedly not been triggered (*Id.* ¶ 26).

These facts demonstrate that the Insurer had *actual notice* of the **Claim**, over and above the simple legal sufficiency of the Insured's notice by its forwarding and reporting the Notice of Default to the Insurer in its May 20th Notification Letter.

Thus, a **Claim** for a **D&O Wrongful Act** was made during the **Policy Period** and reported to the Insurer. The Insurer is therefore obligated to pay the Insured's **Loss**. **Loss** includes **Defense Costs**, which include "[a]ny reasonable and necessary legal fees and expenses incurred in the defense of a **Claim** . . . with the **Underwriter's** consent…" Def. Stmt. ¶¶ 8-9. Accordingly, a **Claim** was made triggering defense coverage under the Policy, and the Insurer's Motion for Summary Judgment should therefore be denied.

### C. *Arguendo*, Even if the Insurer's Notice to the Insurer was Technically Insufficient (which it was not), the Insurer is Estopped from Raising that Argument

Insurer is estopped from claiming that the Insured's May 20th Notification Letter was insufficient notice of the **Claim**. "Equitable estoppel is based on principles of fair play and essential justice and arises when one party lulls another party into a disadvantageous legal position." *Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1330-31 (S.D. Fla. 2010) aff'd, 477 Fed. Appx. 702 (11th Cir. 2012) (citing *Fla. Dep't of Health & Rehab. Servs. v. S.A.P.*, 835 So.2d 1091, 1096 (Fla.2002)). The doctrine "presupposes a legal shortcoming in a party's case that is directly attributable to the opposing party's misconduct ... [and] bars the wrongdoer from asserting that shortcoming and profiting from his or her own misconduct." *Id.* (citing *Major League Baseball v. Morsani,* 790 So.2d 1071, 1077 (Fla.2001)).

"The essential elements of estoppel are '(1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance

thereon.'" *Lloyds Underwriters at London v. Keystone Equip. Fin. Corp.*, 25 So. 3d 89, 93 (Fla. 4th DCA 2009) (quoting *Curci Village Condo. Ass'n v. Maria,* 14 So.3d 1175, 1177 (Fla. 4th DCA 2009) (quoting *State v. Harris,* 881 So.2d 1079, 1084 (Fla.2004))). "The 'representation' upon which an estoppel may be predicated may consist of words, conduct, or, if there is a duty to speak, silence." *Id.*

As it pertains to estoppel and waiver, "Florida law draws a distinction between provisions of forfeiture and provisions of coverage." *Keystone Equip. Fin. Corp.*, 25 So. 3d at 92. Accordingly, "an insurer may be estopped by its conduct from seeking a Forfeiture of a policy." *Id.* "The distinction between a provision of forfeiture and one of coverage has been said to turn upon whether the loss was covered by the contract in the first instance and is asserted to have been lost or nullified as a consequence of the actions of the insured; if this is the case, then the provision is one of forfeiture. *Id.*, *see also, Peters v. Great Am. Ins. Co., N.Y.,* 177 F.2d 773, 779 (4th Cir.1949) ("'If by the contract the insured [sic-insurer] assumed a stated risk primarily, and provided for a forfeiture upon the happening of certain conditions, its right to claim such forfeiture may be waived.'" (quoting *Keistler Co. v. Aetna Ins. Co., Hartford, Conn.,* 124 S.C. 32, 117 S.E. 70, 75 (1923))).

Here, the Insurer is estopped from claiming that the Insured's May 20th Notification Letter was insufficient notice of the **Claim** because, through its actions, the Insurer "lull[ed] [the Insured] into a disadvantageous legal position." *Mid-Continent Cas. Co*, 742 F. Supp. 2d at 1330-31. It was clear from the Insured's statement in its May 20th Notification Letter that it believed coverage of **Defense Costs** associated with the **Claim** (i.e. Notice of Default) was triggered under the Policy by effect of that notice, stating: (a) "the Insured has elected Kluger, Kaplan, Silverman, Katzen & Levine, P.L. as its counsel of choice," and (b) "[p]lease respond to

this letter to acknowledge the Insured's *claim for coverage* under the Policy and to acknowledge and approve the retention of our Firm in connection with this matter." OSMF ¶ 15 (emphasis added). It was further clear from the Insured's counsel's conversations with Mr. Magee of the Insurer that the Insured believed its attorneys' fees associated with its defense of the **Claim** (i.e. Notice of Default) would be reimbursed by the Insurer. *Id.* ¶¶ 26, 28-30. Furthermore, counsel for the Insured made *multiple* requests for the Insurer to pay its attorneys' fees, fully demonstrating to the Insurer beyond a shadow of a doubt that the Insured was under the impression that coverage had been triggered by notice of the **Claim**. *Id.* ¶ 26.

Despite these clear signals to the Insurer that the Insured believed its notice to have been sufficient, the Insurer failed for months (and until this litigation began) to contend that there was any lacking in the Insured's notice of the **Claim**. *Id*. On the contrary, the Insurer played an active role in leading the Insured to believe that its notice was sufficient and that its **Defense Costs** were thereby covered under the Policy. More specifically, the Insurer:

- made a *reservation of rights*, or a "*coverage reservation*," suggesting that defense coverage had been triggered (*Id.* ¶¶ 15-16);
- failed to deny coverage of **Defense Costs** in response to the Insured's May 20th request that it "[p]lease respond to this letter to acknowledge the Insured's *claim for coverage* under the Policy and to acknowledge and approve the retention of our Firm in connection with this matter" (*Id.* ¶ 16);
- requested updates on the status of the dispute within which the **Claim** was made by the City of North Miami against the Insured (*Id.* ¶¶ 18, 21, 28);
- approved the Insured's choice of counsel in connection with the **Claim**, requesting bills for attorneys' fees and attaching litigation guidelines (*Id.* ¶¶ 20, 28-31);

14

- received on three separate occasions the Insured's bills for attorneys' fees and requests for payment without notifying the Insured of any contention that coverage of **Defense Costs** had purportedly not been triggered (*Id.* ¶ 26).

Based on this, it is clear that the Insurer is estopped from claiming a technical insufficiency in the Insured's notice of the **Claim**. *Keystone Equip. Fin. Corp.*, 25 So. 3d at 93 (the elements of estoppel are "(1) a representation as to a material fact that is contrary to a later-asserted position, (2) reliance on that representation, and (3) a change in position detrimental to the party claiming estoppel, caused by the representation and reliance thereon."). First, the Insurer ***represented*** through its correspondence and through its strategic silence that coverage of **Defense Costs** had been triggered under the Policy (which means that the Insured's notice was sufficient). OSMF ¶¶ 15-16, 18, 21, 26, 28-31. Furthermore, the Insured relied on those representations to its detriment, which satisfies the second and third prongs of estoppel. *Keystone Equip. Fin. Corp.*, 25 So. 3d at 93. Had the Insurer responsibly made its contentions to the Insured, or at least clarified its position upon learning that the Insured believed coverage of **Defense Costs** had been triggered, the Insured would have taken corrective action to comply with whatever insufficiency of notice the Insurer contended (although making sure not to waive any rights to rely on the May 20th notice), thereby triggering coverage of **Defense Costs** from at least that date. OSMF ¶ 32. Instead, the Insurer chose to "play along" and otherwise remain silent for months, while the Insured accumulated significant attorneys' fees in defense of the **Claim**. *Id.* ¶ 26.

This is a classic case of estoppel. *Mid-Continent Cas. Co.*, 742 F. Supp. 2d at 1330-31 (estoppel "arises when one party lulls another party into a disadvantageous legal position"). And "generally 'questions of waiver and estoppel typically involve fact issues inappropriate for

summary judgment...."" *Scheibe v. Bank of Am., N.A.*, 822 So. 2d 575, (Mem)-576 (Fla. 5th DCA 2002) (citing *Woodruff v. Government Employees Ins. Co.,* 669 So.2d 1114, 1115 (Fla. 1st DCA 1996) (citing *Mutual of Omaha Ins. Co. v. Eakins,* 337 So.2d 418 (Fla. 2d DCA 1976); *Six L's Packing Co., Inc. v. Florida Farm Bureau Mut. Ins. Co.,* 268 So.2d 560 (Fla. 4th DCA 1972)); *Consortion Trading Int'l, Ltd. v. Lowrance,* 682 So.2d 221, 222 (Fla. 3d DCA 1996) ("In the instant case, final summary judgment was not appropriate where the defendants had properly pled affirmative defenses to the foreclosure action that sounded in waiver, estoppel, and bad faith. These defenses raised genuine issues of material fact...."); *Dusich v. Horley,* 525 So.2d 507, 509 (Fla. 2d DCA 1988); *Parker v. Dinsmore Co.,* 443 So.2d 356, 358 (Fla. 1st DCA 1983) ("Summary judgment is particularly unsuitable in those cases where 'the facts and circumstances indicate a *possibility* of an estoppel or a waiver.' ") (quoting 22 Fla. Jur.2d *Estoppel and Waiver* § 9 (1980) (emphasis supplied)) (citing *Macina v. Magurno,* 100 So.2d 369, 373 (Fla.1958))).

The Insurer is estopped from arguing that the Insured's notice of the Notice of Default was insufficient, and at the very least "the facts and circumstances indicate a *possibility* of an estoppel," making "[s]ummary judgment [ ] particularly unsuitable." *Parker,* 443 So.2d at 358. Therefore, coverage of **Defense Costs** was triggered under the Policy, and the Insurer is obligated to pay the Insured's attorneys' fees in defense of the Notice of Default. Accordingly, the Insurer's Motion should be denied.

## IV.   CONCLUSION

For the reasons set forth above and in the Insured's Statement of Facts, the Insurer's Motion for Summary Judgment should be denied.

Respectfully submitted,

KLUGER, KAPLAN, SILVERMAN,
KATZEN & LEVINE, P.L.
*Attorneys for Plaintiff*
Miami Center, Suite 2700
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 379-9000
Facsimile: (305) 379-3428

By: /s/ Michael S. Perse
  Michael S. Perse
  Florida Bar No. 603619
  mperse@klugerkaplan.com

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that service of a true and correct copy of this document was made on **February 13, 2015**, by electronic filing and the CM/ECF system, which will send notice to the attorneys listed on the service list below.

By: /s/ Michael S. Perse
  Michael S. Perse

## SERVICE LIST

**Valerie Shea, Esq.**
valerie.shea@sedgwicklaw.com
**Jeannine C. Jacobson, Esq.**
jeannine.jacobson@sedgwicklaw.com
Sedgwick LLP
2400 East Commercial Blvd., Suite 1100
Fort Lauderdale, FL 33308
Telephone: (954) 958-2500
Facsimile: (954) 958-2513